Slip Op. 19-148

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HYUNDAI STEEL COMPANY, <br><br> Plaintiff, <br><br> and <br><br> SEAH STEEL CORPORATION, <br><br> Consolidated Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> WHEATLAND TUBE COMPANY, <br><br> Defendant-Intervenor. | Before: Jennifer Choe-Groves, Judge <br><br> Consol. Court No. 18-00154 |

**OPINION**

[Remanding the U.S. Department of Commerce's final results in the 2015–2016 administrative review of the antidumping duty order covering circular welded non-alloy steel pipe from the Republic of Korea.]

Dated: November 25, 2019

Henry D. Almond and Kang Woo Lee, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., argued for Plaintiff Shandong Yongtai Group Co., Ltd.  With them on the briefs were J. David Park and Daniel R. Wilson.

Jeffrey M. Winton and Amrietha Nellan, Law Office of Jeffrey M. Winton PLLC, of Washington, D.C., argued for Consolidated Plaintiff SeAH Steel Corp.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., and Hardeep K. Josan, International Trade Field

Office, U.S. Department of Justice, of New York, NY, argued for Defendant United States.  With them on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and L. Misha Preheim, Assistant Director.  Of counsel on the briefs was James Ahrens, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Paul W. Jameson, Schagrin Associates, of Washington, D.C., argued for Defendant-Intervenor Wheatland Tube Company.  With him on the brief was Roger B. Schagrin.

Choe-Groves, Judge:  Plaintiff Hyundai Steel Company ("Plaintiff" or "Hyundai") and SeAH Steel Corporation ("Consolidated Plaintiff" or "SeAH") (collectively, "Plaintiffs") bring this consolidated action contesting Commerce's final results in the administrative review of the antidumping duty order covering circular welded non-alloy steel pipe ("CWP") from the Republic of Korea ("Korea").  Circular Welded Non-Alloy Steel Pipe from the Republic of Korea, 83 Fed. Reg. 27,541 (Dep't Commerce June 13, 2018) (final results of antidumping duty administrative review; 2015–2016) ("Final Results"); see also Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review of Circular Welded Non-Alloy Steel Pipe from the Republic of Korea; 2015-2016, bar code 3716138-01 (June 7, 2018) ("Final IDM").  Before the court are Plaintiffs' Rule 56.2 motions for judgment on the agency record.  For the reasons discussed below, the court remands Commerce's Final Results.

**ISSUES PRESENTED**

1. Whether Commerce's particular market situation finding was supported by substantial evidence; and

2. Whether Commerce's calculation of a combined single assessment rate for Hyundai Steel USA ("HSU") and Hyundai Corporation USA ("HCU") was supported by substantial evidence and in accordance with law.

## BACKGROUND

The U.S. Department of Commerce ("Commerce") published the <u>Final Results</u> on June 13, 2018. <u>Final Results</u>. Plaintiff commenced this action to contest certain aspects of the <u>Final Results</u> on June 28, 2018. Summons, June 28, 2018, ECF No. 1; Compl., June 28, 2018, ECF No. 5. The court entered a statutory injunction on July 6, 2018. Order for Statutory Inj. Upon Consent, July 6, 2018, ECF. No. 9. Wheatland Tube Company ("Defendant-Intervenor" or "Wheatland") intervened on July 30, 2018. Order, July 30, 2018, ECF No. 21. The administrative record was filed on August 7, 2018. Letter from Zachary Simmons, Office of Chief Counsel for Trade Enforcement & Compliance, Commerce, to Mario Toscano, Clerk of the Court, U.S. Court of International Trade, Aug. 7, 2018, ECF No. 22. This case was consolidated with Court No. 18-00164 on August 27, 2018. Order, Aug. 27, 2018, ECF No. 25.

Hyundai and SeAH moved for judgment on the agency record. Pl.'s Mot. J. Agency R. ("Pl.'s Mot."), Jan. 15, 2019, ECF No. 38; Consol. Pl.'s Mot. J. Agency R. ("Consol. Pl.'s Mot."), Jan. 14, 2019, ECF No. 36. Defendant United States ("Defendant" or "United States") and Defendant-Intervenor responded. Def.'s Resp. Opp'n Mots. J. Agency R. ("Def.'s Resp.") May 7, 2019, ECF No. 44; Def.-Intervenor's Resp. Opp'n Mots. J. Agency R. ("Def.-Intervenor's Resp."), May 7, 2019, ECF No. 42. Plaintiff and Consolidated Plaintiff replied. Pl.'s Reply, June 6, 2019, ECF No. 47; Consol. Pl.'s Reply, June 6, 2019, ECF No. 46. The joint appendix was filed on June 20, 2019. Joint App'x, June 20, 2019, ECF No. 51. The court heard oral argument on September 11, 2019. Oral Argument Hr'g, Sept. 11, 2019, ECF No. 58. The Parties filed supplemental briefing. Wheatland's Resp., Sept. 13, 2019, ECF No. 59; Hyundai's Resp., Sept. 13, 2019, ECF No. 60; SeAH's Resp., Sept. 13, 2019, ECF No. 61; Commerce's Resp., Sept. 13, 2019, ECF No. 61.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c), which grant the court the authority to review actions contesting the final results of an administrative review of an antidumping duty order. The court will uphold Commerce's determinations, findings, or conclusions unless they are unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

**DISCUSSION**

I.   **Particular Market Situation**

   A.  **Governing Law**

Under the Tariff Act of 1930, as amended, Commerce conducts antidumping duty investigations and determines whether goods are being sold at less-than-fair value. See 19 U.S.C. § 1673. If the Department finds that subject merchandise is being sold at less-than-fair value, and if the U.S. International Trade Commission finds that these less-than-fair value imports materially injure a domestic industry, the Department issues an antidumping duty order imposing antidumping duties equivalent to "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." Id.  Generally, export price is defined as the price at which the subject merchandise is first sold in the United States, whereas the normal value represents the price at which the subject merchandise is sold in the exporting country. See id. §§ 1677a(a), 1677b(a)(1)(B)(i). If Commerce cannot determine the normal value of the subject merchandise based on price, then the statute authorizes Commerce to calculate a constructed value. Id. § 1677b(a)(4). The constructed value shall be an amount equal to the sum of, for instance, "the cost of materials and fabrication or other processing of any kind

employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade." Id. § 1677b(e)(1).

The Trade Preferences Extension Act of 2015 ("TPEA") amended the Tariff Act to allow Commerce to consider certain sales and transactions to be outside of the ordinary course of trade when "the particular market situation prevents a proper comparison with the export price or constructed export price." Id. § 1677(15). When calculating constructed value under the revised version of the statute, if Commerce finds the existence of a particular market situation "such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology." Id. § 1677b(e).

The legislative history of the TPEA reflects a desire to give Commerce the ability to choose the appropriate methodology when a particular market situation exists. One Senate Report stated that modifications to the Tariff Act under the TPEA "provide that where a particular market situation exists that distorts pricing or cost in a foreign producer's home market, the Department of Commerce has flexibility in calculating a duty that is not based on distorted pricing or costs." S. Rep. No. 114-45, at 37 (2015). In a hearing before the House of Representatives, Representative Patrick Meehan noted that under the TPEA, Commerce would be "empowered . . . to disregard prices or costs of inputs that foreign producers purchase if the Department of Commerce has reason to believe or suspects that the inputs in question have been subsidized or dumped" in the interest of creating an accurate record and protecting domestic workers. 161 Cong. Rec. H4690 (daily ed. June 25, 2015) (statement of Rep. Meehan).

Commerce has the ability to choose the appropriate methodology so long as it comports with its statutory mandate and provides a reasoned explanation. See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1983); Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996).  The statute's language and legislative history permit Commerce to consider the cumulative effect and the totality of the conditions in the foreign market when making a finding of a particular market situation.  See Nexteel Co., Ltd. v. United States, 43 CIT ___, ___, 355 F. Supp. 3d 1336, 1349 (2019) ("Nexteel I").

Plaintiffs challenge Commerce's finding that a particular market situation existed in Korea that distorted the cost of production of CWP.  Plaintiffs contend that in finding the existence of a particular market situation, Commerce relied upon the same insufficient facts and record evidence that formed the basis of its unsupported finding of a particular market situation in the first administrative review of the antidumping duty order covering oil country tubular goods ("OCTG") from Korea.  Pl.'s Reply 1–3; Consol. Pl.'s Reply 1–5.[1]

### B. Commerce's Findings Pertaining to a Particular Market Situation in the First Administrative Review of OCTG and the Court's Ruling in Nexteel I

Plaintiffs assert that because the U.S. Court of International Trade concluded that Commerce's finding of a particular market situation in the OCTG first administrative review was unsupported by substantial evidence, see Nexteel I, 43 CIT at ___, 355 F. Supp. 3d at 1350–51, Commerce's finding of a particular market situation in this administrative review of the antidumping duty order covering CWP is similarly unsupported by substantial evidence.  Pl.'s Reply 1–3; Consol. Pl.'s Reply 1–5.

---

[1] The main physical input for the production of both the CWP at issue here and OCTG is hot-rolled steel.

In the OCTG first administrative review, Maverick Tube Corporation ("Maverick") alleged the existence of four particular market situations based on the following: (1) subsidies provided by the Government of Korea to producers of hot-rolled coil; (2) the flood of Chinese hot-rolled flat products and the resulting pressure on Korean domestic hot-rolled coil prices; (3) strategic alliances between Korean hot-rolled coil suppliers and Korean oil country tubular good producers; and (4) the Government of Korea's influence on the cost of electricity.  See Nexteel I, 43 CIT at ___, 355 F. Supp. 3d at 1345–46.  Taking each of these allegations in turn, Commerce found preliminarily that no particular market situation existed based upon the evidence in the record.  See 43 CIT at ___, 355 F. Supp. 3d at 1346, 1349.

As to Maverick's allegation that the Korean Government subsidized the production of hot-rolled coil, the Department noted that Maverick submitted documents from a countervailing duty investigation on hot-rolled coil but found that "the record d[id] not contain evidence that the Government of Korea ha[d] introduced policies or mandates with regard to [hot-rolled coil] that distort the cost to produce the subject merchandise for either NEXTEEL or SeAH."  43 CIT at ___, 355 F. Supp. 3d at 1350 (quoting Commerce's Particular Market Situation Memorandum 15 ("Commerce's Particular Market Situation Mem.") (rejecting each allegation of Maverick's assertion of a particular market situation)).

As to Maverick's allegation that the flood of Chinese hot-rolled flat products caused the global price of hot-rolled coil to fall, Commerce found that Maverick had not demonstrated that the price distortions were specific to the Korean market.  See id. (citing Commerce's Particular Market Situation Mem. 15).

As to Maverick's allegation that "strategic alliances" between Korean hot-rolled coil suppliers and oil country tubular goods producers resulted in favorable pricing that constituted a

particular market situation, Commerce discounted an affidavit provided by Maverick because it pertained to discussions that occurred before the period of review and did not contain information about specific agreements. See id. (citing Commerce's Particular Market Situation Mem. 16). Maverick also pointed to the fact that NEXTEEL and SeAH purchased hot-rolled coil from POSCO during the period of review as indicative of a "strategic alliance." See id. (citing Commerce's Particular Market Situation Mem. 17). Commerce found this evidence unpersuasive because POSCO is a major supplier of hot-rolled coil in Korea and because NEXTEEL and SeAH also purchased hot-rolled coil from other suppliers. See id. (citing Commerce's Particular Market Situation Mem. 17).

As to Maverick's allegation that the Korean Government's "pervasive intervention" in the electricity market distorted the price of electricity, Commerce found that "there is no evidence to suggest that electricity prices charged to producers of either [hot-rolled coil] or [oil country tubular goods] in Korea do not reasonably reflect the cost of production for the electricity or are otherwise anomalous." See id. at 1351 (quoting Commerce's Particular Market Situation Mem. 18).

After issuance of Commerce's Particular Market Situation Memorandum in OCTG, Commerce did not receive any new factual information before issuance of its final results. See 43 CIT at ___, 355 F. Supp. 3d at 1349. Nevertheless, Commerce reversed its conclusion and determined in its final results in the OCTG first administrative review that the same record supported finding the existence of a particular market situation. See 43 CIT at ___, 355 F. Supp. 3d at 1346. As noted in Nexteel I, Commerce attempted to justify its reversal on the "cumulative effect" of the four allegations on the Korean oil country tubular goods market through the cost of oil country tubular goods inputs. See id. Commerce explained that it had "refocused the

analysis on the totality of the conditions in the Korean market" and found "that the allegations represent, instead, facets of a single particular market situation." See id.

In Nexteel I, upon review of the governing statute and the administrative record, the Court held that while Commerce's finding of a single particular market situation based on the totality of circumstances was reasonable in theory, Commerce's finding in the first administrative review was unsupported by substantial evidence. See 43 CIT at ___, 355 F. Supp. 3d at 1349–51. The record lacked evidence to demonstrate that any of allegations made by Maverick, as to Korean hot-rolled coil subsidies, imports from China, strategic alliances, and electricity pricing interference, established the existence of a particular market situation that distorted the cost of production of OCTG. See id. The Court rejected Commerce's position "that individually, the facts would not support a particular market situation, but when viewed as a whole, these same facts could support the opposite conclusion. See 43 CIT at ___, 355 F. Supp. 3d at 1351.

### C. Commerce's Findings Pertaining to a Particular Market Situation in the Second Administrative Review of OCTG and the Court's Ruling in Nexteel II

In the OCTG second administrative review, Commerce again determined that a particular market situation existed in Korea that distorted the cost of production of OCTG. See Nexteel Co. v. United States, 43 CIT ___, ___, 392 F. Supp. 3d 1276, 1287–88 (2019) ("Nexteel II"). In the OCTG second administrative review, Maverick made the same four allegations that it had made in the OCTG first administrative review and submitted the same supporting evidence. See 43 CIT at ___, 392 F. Supp. 3d at 1288. In determining that a particular market situation existed in the OCTG second administrative review, Commerce relied on its prior finding of the existence of a particular market situation in the first administrative review and continued to find that the

circumstances remained "largely unchanged." See 43 CIT at ___, 392 F. Supp. 3d at 1287. Commerce noted that "facts in the [second] review are largely identical to the facts in the first administrative review, and the same evidence is on the record of the instant review." See 43 CIT at ___, 392 F. Supp. 3d at 1288.

Because Commerce's original finding of a particular market situation was not supported by substantial evidence, in Nexteel II, the Court held that Commerce's finding of a particular market situation in the second administrative review was not supported by substantial evidence. See id. The Court rejected Defendant-Intervenor United States Steel Corporation's attempt to argue that the record in the second administrative review was materially distinguishable from the record of the first administrative review because the record in the second review contained more exhibits. See id. The Court found that Commerce did not rely on the new exhibits in making its determination. See id. Instead, Commerce expressly relied on substantially the same facts and the same record evidence to support its finding of a particular market situation in the second administrative review. See id. As a result, the Court concluded that Commerce's finding of a particular market situation that distorted the cost of production of OCTG lacked substantial evidence. See id.

### D. Commerce's Findings Pertaining to a Particular Market Situation in the Instant Administrative Review of CWP

In the instant administrative review of CWP from Korea, Commerce determined that a particular market situation existed in Korea that distorted the cost of production of CWP. Final IDM 11–13. In reaching that determination, Commerce relied on its prior finding of the existence of a particular market situation in the first administrative review of OCTG from Korea. Id. Defendant-Intervenor Wheatland made the same four allegations that Maverick made in the OCTG first administrative review and submitted the same supporting exhibits that were

submitted in the first and second OCTG administrative reviews.  See Final IDM 11-12 (citing documents provided in the OCTG administrative reviews).  Commerce found that the circumstances remained "largely unchanged" from the allegations and the evidence that led to the finding of a particular market situation as to OCTG in Korea.  Id. at 11.  Commerce itself stated that "the facts in the instant review are largely identical to the facts in OCTG from Korea POR 1, and the same evidence is on the record of the instant review."  Id. at 13.  Because Commerce's finding of a particular market situation in the administrative review of OCTG from Korea was not supported by substantial evidence, see Nexteel I, 43 CIT at ___, 355 F. Supp. 3d at 1351, and Commerce's finding of a particular market situation in the instant review was based upon "the same evidence . . . on the record," Final IDM 13, the court is compelled to conclude that Commerce's finding of a particular market situation in the instant review is also not supported by substantial evidence.

The court rejects Defendant-Intervenor Wheatland's contention that this court should sustain Commerce's finding because the record in the CWP administrative review contains more factual information.  Wheatland states that it submitted twenty-four exhibits to Commerce in support of its October 16, 2017, Allegation of a Particular Market Situation in the administrative review of CWP, and Wheatland emphasizes that only seven of those exhibits were in the record before Commerce in the OCTG reviews.  Def.-Intervenor's Resp. 4; Wheatland's Allegation of a Particular Market Situation, Oct. 16, 2017, ECF No. 50-3.

Despite the more expansive record, the court finds that Commerce relied upon virtually the same record evidence that was present in the OCTG record in making its particular market situation determination in the instant review.  Compare id. at 4 (acknowledging that Attachments 12 and 13 to Wheatland's Allegation of a Particular Market Situation were part of the OCTG

record) with Final IDM 11–12 (relying upon Attachments 12 and 13 to Wheatland's Allegation of a Particular Market Situation in finding a particular market situation).  Based upon Commerce's record citations in the Final IDM, there is one exhibit upon which Commerce purportedly relied in making its particular market situation finding that was not in the OCTG record.  See Final IDM 12 n.22 (citing Attachment 11 to Wheatland's Allegation of a Particular Market Situation).  Yet, when pressed at oral argument, Commerce's counsel conceded that there is no additional evidence whatsoever in this record that supports its finding of a particular market situation that was not present in the OCTG review.  Oral Argument Hr'g at 25:40–26:26, 29:52–31:10, Sept. 11, 2019, ECF No. 58.[2]  As in Nexteel II, Commerce's reliance on its previous

---

[2]     Court:  Wouldn't you agree that even if the conclusion was that the totality of the four factors equaled the particular market situation, the evidence that supported that was the same evidence that was looked at in Nexteel I and II, which, individually, the Government found did not support a particular market situation?  Individually, on that record evidence.

    Defendant:  In the preliminary determination?  In the OCTG I, yes.  The evidence for the. . . preliminary determination in OCTG underlying the four factors is, as Commerce stated, the IDM is largely identical to the one in this case. Yes.

Oral Argument Hr'g at 25:40–26:26.

    Court:  The thing that troubles me, though, is that didn't the Government make findings though that each of those four factors did not give rise to a particular market situation, individually, when it looked at the facts in the record?  So, for example, just taking the second factor. . . whether the distorted effects of Chinese hot-rolled steel created a distortion. . . the Government found specifically . . . that was not supported by substantial evidence when it looked at the record and yet here it's making a finding that it is a particular market situation.

    Defendant:  And again, that's, again going back to each record, each review, each proceeding is separate, Commerce did not make that finding in this review. . . . That was in the preliminary determination of OCTG—

    Court:  But it's based on the same evidence, correct?

    Defendant:  It's largely identical, the evidence. Yes. . . .

Oral Argument Hr'g at 29:52–31:10.

Case 1:18-cv-00154-JCG   Document 64   Filed 11/25/19   Page 13 of 16
Consol. Court No. 18-00154                                                                                                Page 13


finding of a particular market situation in this administrative review is clear on the record. See Final IDM 11–13.

The court also rejects Wheatland's contention that under a totality of the circumstances approach, Commerce can demonstrate the existence of a particular market situation based upon the combination of Korean hot-rolled coil subsidies, imports from China, strategic alliances, and electricity pricing interference, even though there is a lack of persuasive evidence to support any one of these allegations. In support, Wheatland relies on US Magnesium LLC v. United States, 839 F.3d 1023, 1028 (Fed. Cir. 2016), which is inapposite. In that case, the court sustained Commerce's classification of retorts as indirect materials instead of direct materials. Id. While the domestic producer argued that Commerce should have followed a four-factor test, the court held that Commerce was not bound to any particular factors and properly applied a totality of the circumstances test. Id. US Magnesium does not stand for the proposition that under a totality of the circumstances test, a collection of unsubstantiated allegations can be combined into a substantiated one. Not even their collective impact can fill the evidentiary void that has plagued Commerce's particular market situation finding through the OCTG reviews and now this review.

For these reasons, the court concludes that Commerce's determination of the existence of a particular market situation in the Final Results is unsupported by substantial evidence. The Final Results are remanded for further proceedings.[3]

## II.     Combined Assessment Rate

Commerce calculated a combined assessment rate for Hyundai's affiliated importers, HSU and HCU, without a concomitant finding of evidence that the affiliated importers were

---

[3] Plaintiffs have presented challenges to other aspects of Commerce's particular market situation finding, including Commerce's failure to conduct a respondent-specific analysis and its use of adverse facts available from another proceeding. The court does not reach those issues.

manipulating their individual assessment rates to their advantage. Hyundai contends that Commerce's calculation of a combined rate for the affiliated importers without evidence of possible manipulation represents a departure from Commerce's prior practice without a reasonable explanation for such a departure.

"When an agency changes its practice, it is obligated to provide an adequate explanation for the change." SKF USA Inc. v. United States, 630 F.3d 1365, 1373 (Fed. Cir. 2011). Commerce need only show that its methodology is permissible under the statute and that it had good reasons for the new methodology. Huvis Corp. v. United States, 570 F.3d 1347, 1353 (Fed. Cir. 2009). If Commerce acted differently than it has consistently acted in similar circumstances without reasonable explanation, then Commerce's actions are arbitrary. Consol. Bearings Co. v. United States, 348 F.3d 997, 1007 (Fed. Cir. 2003).

In general, Commerce calculates a dumping margin for each entry of the subject merchandise under review. 19 U.S.C. § 1675(a)(2)(A). Pursuant to 19 C.F.R. § 351.212(b)(1), Commerce "normally will calculate an assessment rate for each importer of subject merchandise covered by the review." 19 C.F.R. § 351.212(b)(1). Commerce has confirmed its normal practice of calculating importer-specific assessment rates:

> When an administrative review is conducted, and where the weighted-average margin of dumping for the exporter or producer is determined to be greater than de minimis, the Department will calculate an importer-specific ad valorem assessment rate for each importer of subject merchandise covered by the review. 19 CFR [§] 351.212(b)(1).

Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification, 77 Fed. Reg. 8101-01, 8103 (Dep't Commerce Feb. 14, 2012).

Notwithstanding Commerce's regular practice of calculating an assessment rate for each importer consistent with 19 C.F.R. § 351.212(b)(1), Commerce points out that it has a longstanding practice of calculating a combined assessment rate when two or more importers are affiliated with one another and a foreign exporter. Def.'s Resp. 38–39. Defendant invokes that practice as a basis for Commerce's decision not to calculate individual assessment rates for Hyundai's affiliates, HSU and HCU. Id. Defendant explains that the purpose behind Commerce's practice of calculating a combined rate for affiliated importers is to prevent affiliated importers from manipulating individual assessment rates. Id.

Hyundai does not dispute that Commerce has a past practice of aggregating affiliated importers but argues that Commerce has adopted such a practice only when the administrative record contains evidence of possible manipulation. Pl's Reply 20–21. Hyundai argues that, in the absence of record evidence of possible manipulation, such as evidence of the affiliates' purchases of the subject merchandise from each other, Commerce should follow its normal practice of calculating a separate rate for each importer. Id. Hyundai contends that Commerce's calculation of a combined rate for its affiliated importers without evidence of possible manipulation represents a departure from Commerce's prior practice without a reasonable explanation for such a departure. Id. Defendant contends that Commerce has established a practice of determining combined assessment rates even in the absence of record evidence of actual manipulation. Def.'s Resp. 38–39.

The court finds that Defendant has not established that Commerce's practice of calculating combined assessment rates for affiliated importers extends to cases where there is no evidence of potential manipulation. The record does not contain sufficient evidence to show Commerce's practice in cases where there is no actual evidence of potential manipulation.

Indeed, Defendant does not cite to a single instance in which Commerce has calculated a combined assessment rate for affiliated importers despite an absence of actual manipulation evidence. Defendant does not explain why such a practice would be reasonable in light of 19 C.F.R. § 351.212(b)(1) or that it is unable to consider the record in determining whether to impose an importer-specific or combined assessment rate. As a result, the court remands the <u>Final Results</u> for further proceedings.

## CONCLUSION

For the foregoing reasons, the court concludes as follows:

1. Commerce's particular market situation analysis is unsupported by substantial evidence; and

2. Commerce's calculation of a combined assessment rate for Hyundai's affiliated importers is unsupported by substantial evidence and not in accordance with law.

An order will issue accordingly.

      /s/ Jennifer Choe-Groves
    Jennifer Choe-Groves, Judge

Dated:  November 25, 2019
       New York, New York