UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY, ) <br> ) <br>         Plaintiff, ) <br> and ) <br> SEAH STEEL CORPORATION, ) <br> ) <br>         Consolidated Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br>         Defendant, ) <br> and ) <br> WHEATLAND TUBE COMPANY, ) <br> ) <br>         Defendant-Intervenor. ) | Court No. 18-00154 |

**DEFENDANT'S RESPONSE TO COMMENTS
REGARDING THE SECOND REMAND REDETERMINATION**

OF COUNSEL:

ELIO GONZALEZ
Senior Attorney
Office of the Chief Counsel
   for Trade Enforcement & Compliance
U.S. Department of Commerce

April 16, 2021

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

PATRICIA M. MCCARTHY
Assistant Director
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-0164
Fax: (202) 307-0972
Email: patricia.mccarthy@usdoj.gov

Attorneys for Defendant United States

# TABLE OF CONTENTS

BACKGROUND .................................................................................................................................. 2

    I.       The Administrative Decision Under Review ............................................................. 2

    II.      Commerce's First Remand Redetermination ............................................................ 2

    III.     The Court's Second Remand Order .......................................................................... 3

    IV.    Commerce's Second Remand Redetermination ....................................................... 4

ARGUMENT ..................................................................................................................................... 6

    I.       Standard of Review .................................................................................................... 6

    II.      Commerce Complied With The Court's Remand Order .......................................... 6

    III.     Commerce's Particular Market Situation Adjustment To The Cost Of Production For The Sales-Below-Cost Test Is In Accordance With Law .............. 9

CONCLUSION ................................................................................................................................ 14

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.Ş. v. United States*,
    426 F. Supp. 3d 1395 (2020) ................................................................................................. 4

*Dong-A-Steel Co. v. United States*,
    475 F. Supp.  (Ct. Int'l Trade 2020) ................................................................................... 4, 6

*Fuji America Corp. v. United States*,
    30 CIT 1991 (2006) ............................................................................................................. 13

*Husteel Co. v. United States*,
    426 F. Supp. 3d 1383 (Ct. Int'l Trade 2020) ......................................................................... 4

*Husteel Co. v. United States*,
    476 F. Supp. 3d 1363 (Ct. Int'l Trade 2020) ......................................................................... 4

*Hyundai Steel Co. v. United States*,
    415 F. Supp. 3d 1293 (Ct. Int'l Trade 2019) ......................................................................... 3

*Hyundai Steel Company v. United States*,
    483 F. Supp. 3d 1273 (Ct. Int'l Trade 2020) ................................................................. passim

*MacLean-Fogg Co. v. United States*,
    100 F. Supp 3d 1349 (Ct. Int'l Trade 2015) .......................................................................... 6

*NEXTEEL Co. v. United States*,
    392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019) ......................................................................... 3

*Saha Thai Steel Pipe Pub. Co. v. United States*,
    422 F. Supp. 3d 1363 (Ct. Int'l Trade 2019) .................................................................... 4, 10

*Saha Thai Steel Pipe Pub. Co. v. United States*,
    476 F. Supp. 3d 13783 (Ct. Int'l Trade 2020) ....................................................................... 4

*Saha Thai Steel Pipe Public Co., Ltd. v. United States*,
    487 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) .................................................................. 10, 11

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ............................................................................................ 13

*Viraj Group, Ltd. v. United States*,
    343 F.3d 1371 (Fed. Cir. 2003) ................................................................................. 6, 7, 8, 12

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................................................................. 6

19 U.S.C. § 1677(15) ............................................................................................................... 5

19 U.S.C. § 1677(15)(A) ....................................................................................................... 11
19 U.S.C. § 1677(15)(C) ....................................................................................................... 11

19 U.S.C. § 1677b .................................................................................................................... 9

19 U.S.C. § 1677b(a) ............................................................................................................... 9

19 U.S.C. § 1677b(a)(1)(B)(i) ............................................................................................ 9, 10

19 U.S.C. § 1677b(b) ............................................................................................................... 6

19 U.S.C. § 1677b(b)(1) .................................................................................................... 9, 11

19 U.S.C. § 1677b(e) .................................................................................................. 4, 5, 9, 10

28 U.S.C. § 1581(c) ................................................................................................................. 7

**OTHER AUTHORITIES**

*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*,
   83 Fed. Reg. 27,541 (Dep't of Commerce June 13, 2018) ................................................. 2

*Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*,
   85 Fed. Reg. 71,055 (Dep't of Commerce Nov. 6, 2020) ................................................. 10

*The Lawyer's Guide to Writing Well* 100 (2d ed. 2002) ....................................................... 14

*The Redbook, A Manual on Legal Style* § 9.9 (2d ed. 2006) ............................................... 14

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY, | ) |
| Plaintiff, | ) |
| and | ) |
| SEAH STEEL CORPORATION, | ) |
| Consolidated Plaintiff, | ) |
| v. | )  Consol. Court No. 18-00154 |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| WHEATLAND TUBE COMPANY, | ) |
| Defendant-Intervenor. | ) |

**DEFENDANT'S RESPONSE TO COMMENTS
REGARDING THE SECOND REMAND REDETERMINATION**

Defendant, the United States, respectfully responds to the comments of plaintiff SeAH Steel Corporation (SeAH) (ECF No. 88), and plaintiff Hyundai Steel Company (Hyundai Steel) (ECF No. 89), concerning the final results of the United States Department of Commerce's (Commerce) second remand redetermination filed in accordance with this Court's decision and remand order in *Hyundai Steel Company v. United States*, 483 F. Supp. 3d 1273 (Ct. Int'l Trade 2020) (*Hyundai Steel II*). Final Results of Redetermination Pursuant to Court Remand, Feb. 2, 2021, ECF No. 85 (Second Remand Results).

For the reasons set forth below, we respectfully request that the Court sustain Commerce's second remand results.

## BACKGROUND

### I.  The Administrative Decision Under Review

This consolidated case involves challenges to the final results of Commerce's administrative review of the antidumping duty order covering circular welded non-alloy steel pipe (CWP) from the Republic of Korea, during the 2015-2016 review period.  *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 83 Fed. Reg. 27,541 (Dep't of Commerce June 13, 2018) (final results admin. review), and accompanying issues and decision memorandum (IDM).  In the final results, "Commerce determined that a particular market situation in Korea distorted the cost of production of CWP based on the cumulative impact of four factors:  (1) Korean subsidies of hot-rolled steel coil; (2) Korean imports of hot-rolled steel coil from China; (3) strategic alliances between Korean hot-rolled steel coil producers and CWP producers; and (4) distortions in the Korean electricity market."  *Hyundai Steel II*, 483 F. Supp. 3d at 1275 (citing IDM at 23).  Applying an upward adjustment to the cost of production based on the subsidy rate of hot-rolled steel, Commerce conducted a sales-below-cost test and excluded certain sales made at prices below the cost of production.  *Id*. at 1275-76 (citations omitted).  Commerce then used the remaining above-cost home market sales to calculate normal value for mandatory respondents Hyundai Steel and Husteel, and it also calculated a combined assessment rate for Hyundai's importers.  *Id*. at 1276 (citations omitted).

### II.  Commerce's First Remand Redetermination

In 2019, the Court held Commerce's particular market situation determination in the final results to be unsupported by substantial evidence because Commerce had relied exclusively on

documents placed on the record of the administrative review of the antidumping duty order covering oil country tubular goods from the Republic of Korea for the 2014-2015 period of review, which the Court held to be insufficient to support Commerce's particular market situation determination in that review. *Hyundai Steel Co. v. United States*, 415 F. Supp. 3d 1293, 1301 (Ct. Int'l Trade 2019) (*Hyundai Steel I*) (citing *NEXTEEL Co. v. United States*, 392 F. Supp. 3d 1276, 1287-88 (Ct. Int'l Trade 2019)). The Court remanded the issue to Commerce for "further proceedings." Second Remand Results at 2 (quoting *Hyundai I*, 415 F. Supp. 3d at 1301).

During the first remand proceedings, Hyundai Steel argued for the first time that the particular market situation provisions in the statute are limited to constructed value, and that Commerce could not lawfully apply a particular market situation adjustment to the cost of production for purposes of the sales-below-cost test. *Id.; see also Hyundai Steel II*, 483 F. Supp. 3d at 1276 ("Hyundai Steel argued for the first time on remand that Commerce's determination contravened the statute by adjusting the cost of production for purposes of the sales-below-cost test.") (citation omitted). Commerce declined to address Hyundai Steel's new argument in the first remand results because the Court had not considered it as part of its holding in the first remand order. Second Remand Results at 2-3 (citations omitted).

### III.  The Court's Second Remand Order

In *Hyundai Steel II*, the Court held that "departure from the general rule of waiver is warranted" in this case, 483 F. Supp. 3d at 1277, and remanded this issue "for Commerce to explain its position regarding the statutory authority to adjust the cost of production for purposes of the sales-below-cost test of Section 1677b(b)." *Id.* at 1279. Although the Court recognized that "there has not been an opinion from the U.S. Court of Appeals for the Federal Circuit on

whether cost-based particular market situation determinations and subsequent adjustments are in accordance with law," *id*. at 1277, the Court added in its second remand opinion that Commerce "should address how its statutory interpretation and reasoning comply with the opinions of the Court of International Trade in the cases listed above." *Id*. at 1279 (referring to *id*. at 1277 (citing *Saha Thai Steel Pipe Pub. Co. v. United States*, 422 F. Supp. 3d 1363, 1368-70 (Ct. Int'l Trade 2019); *Husteel Co. v. United States*, 426 F. Supp. 3d 1383, 1383-89 (Ct. Int'l Trade 2020); *Borusan Mannesmann Boru Sanayi Ve Ticaret A.Ş. v. United States*, 426 F. Supp. 3d 1395, 1411-12 (2020))); *see also id*. at 1279 (citing *Dong-A-Steel Co. v. United States*, 475 F. Supp. 1317 (Ct. Int'l Trade 2020); *Husteel Co. v. United States*, 476 F. Supp. 3d 1363, 1369-73 (Ct. Int'l Trade 2020); *Saha Thai Steel Pipe Pub. Co. v. United States,* 476 F. Supp. 3d 1378, 1382-86 (Ct. Int'l Trade 2020)).

## IV.    Commerce's Second Remand Redetermination

In the second remand results, Commerce, as ordered by the Court, explained its statutory interpretation.  Second Remand Results at 3-7.  Commerce first explained that Section 504 of the Trade Preferences Extension Act of 2015 (TPEA) had "added the concept of 'particular market situation' in the definition of the term 'ordinary course of trade,'" for purposes of constructed value under 19 U.S.C. § 1677b(e), and through these provisions for purposes of cost of production under 19 U.S.C. § 1677b(b)(3).  Second Remand Results at 3.  Section 1677b(e) expressly provides that "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology.  *Id*. (quoting 19 U.S.C.

§ 1677b(e)). Commerce explained that the TPEA had granted it "the authority to determine whether a {particular market situation} exists within the foreign market from which the subject merchandise is sourced, and to determine whether the cost of materials, fabrication, or processing of such merchandise fail to accurately reflect the {cost of production} in the ordinary course of trade." *Id*. at 3-4 (citing 19 U.S.C. § 1677b(e)). Commerce added although the statute does not define "particular market situation," the Statement of Administrative Action (SAA) explains that examples of where a situation might exist include "where there is government control over pricing to such an extent that home market prices cannot be competitively set." *Id*. at 4 (quoting Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) at 822).

Commerce also explained that the TPEA had further amended the statute to provide it with additional discretion when applying the particular market situation concept to determine normal value. *Id*. at 4 (citing 19 U.S.C. § 1677(15)). It concluded that "an interpretation that {it} cannot analyze a {particular market situation} allegation to determine whether comparison-market sales prices were below costs would defeat the very purpose of an 'ordinary course of trade' analysis under the {particular market situation} provision, which is to ensure that the distortions caused by a {particular market situation} do not prevent fair comparisons of normal value to U.S. price." *Id*. at 5.

Commerce also cited legislative history of the TPEA indicating that Congress had intended, via the particular market situation provision, to provide Commerce with the ability to address price and cost distortions that are caused by dumping or subsidization. *Id*. at 5-7. At bottom, Commerce concluded that "{i}t would be illogical to conclude that Congress intended for Commerce not to rely on costs distorted by a {particular market situation} for {constructed

value}, but still rely on those same distorted costs for purposes of {cost of production} and the sales-below-cost test." *Id*. at 7.

Finally, Commerce acknowledged that the Court has issued numerous decisions rejecting its statutory interpretation, but stated its respectful disagreement with the statutory interpretation found in those decisions. *Id*. Commerce further observed that "these cases are not yet final and conclusive." *Id*.

## ARGUMENT

### I. Standard of Review

In remand proceedings, the Court will sustain Commerce's antidumping determinations if they are "in accordance with the remand order," and are "supported by substantial evidence and are otherwise in accordance with law." *See MacLean-Fogg Co. v. United States*, 100 F. Supp 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. 1516a(b)(1)(B)(i)).

### II. Commerce Complied With The Court's Remand Order

In *Hyundai Steel II*, the Court directed Commerce "to explain the statutory authority to conduct a cost-based particular market situation analysis when normal value is based on home market sales and to adjust the cost of production for purposes of the sales-below-cost test of 19 U.S.C. § 1677b(b), specifically within the context of relevant caselaw from the Court of International Trade." *See* 483 F. Supp. 3d at 1281.

In the second remand results, Commerce did precisely that, and it expressed respectful disagreement with the Court's precedent, set forth in several nonfinal opinions, rejecting Commerce's statutory interpretation presented in other cases. *See* Second Remand Results at 7. Plaintiffs' comments contending that Commerce did not comply with the Court's remand order are not only incorrect, but also disregard *Viraj Group, Ltd. v. United States*, 343 F.3d 1371,

1375-77 (Fed. Cir. 2003), binding Federal Circuit precedent which neither Hyundai Steel nor SeAH cite, much less reconcile with their untenable arguments.

In its comments, SeAH appears to contend, erroneously, that the Court's opinions previously rejecting Commerce's statutory interpretation are, "on the contrary," final and conclusive. SeAH Cmts. at 2. SeAH does not cite any support for this suggestion, and there is none. Alternatively, SeAH could be contending that the lack of finality in the Court's previous rulings is irrelevant – that the United States simply has no appeal rights and that Commerce was required to waive its statutory interpretation in this case on remand. *See id*. But SeAH quickly backs off of this outlandish suggestion by contending instead that "{i}n such circumstances, it may be appropriate for Commerce to ask the Court for reconsideration or to appeal the Court's decision to the Federal Circuit." *Id*. at 3. SeAH can cite no authority for its novel position that, to preserve its appeal rights regarding Commerce's substantive statutory interpretation in the second remand results, the United States was required, upon issuance of *Hyundai Steel II*, and before Commerce had even issued the second remand results, to seek an interlocutory appeal of the Court's nonfinal remand order. SeAH does not even attempt to explain how the Federal Circuit could possibly exercise subject-matter jurisdiction to entertain an interlocutory appeal of the Court's second remand order in this case, and, in that context, review the merits of the Court's statutory holdings previously set forth in *non-final decisions issued in several other separate and unrelated cases*. Indeed, the word ripeness appears nowhere in SeAH's comments.

SeAH's failure to acknowledge *Viraj Group* is fatal to its demand that Commerce be "sanction{ed}," *see id*. at 3 n.6, 4, for doing what the Court ordered it to do in its remand order. In that case, the Federal Circuit explained the elemental rules of finality and how and why the United States possesses standing to appeal an adverse remand ruling issued in an early stage of

litigation once final judgment enters, often following numerous remands. *See* 343 F.3d at 1375-77. Because the United States always appears to be, at the time of final judgment, the nominally prevailing party in a case brought under 28 U.S.C. § 1581(c), the Federal Circuit explained that, in reality, the United States is frequently the non-prevailing party; so long as Commerce issues a remand determination under protest, that issue will be preserved for later appeal following the eventual issuance of a final judgment. *Id*. at 1376.

This case is slightly more complicated procedurally, only because Hyundai Steel failed to present the threshold statutory interpretation issue before the first remand proceeding, and the Court thus was faced with the question of waiver in *Hyundai Steel II*, not the merits of Commerce's statutory interpretation. *See Hyundai Steel II*, 483 F. Supp. 3d at 1276 ("Hyundai Steel argued for the first time on remand that Commerce's determination contravened the statute by adjusting the cost of production for purposes of the sales-below-cost test.") (citation omitted). In the second remand results, Commerce accepted the Court's holding that the issue was not waived and explained its statutory interpretation as it was ordered to do. *See* Second Remand Results at 2-7. Although Commerce expressed its respectful disagreement with the Court's precedent regarding the statutory interpretation issue presented in other cases, *see id*. at 7, there was no basis for Commerce to issue its statutory interpretation for the first time in this case under protest. There was nothing for Commerce to protest—it had accepted the Court's no-waiver holding in *Hyundai Steel II*.

For its part, Hyundai Steel's comments are less extreme than those of SeAH, but Hyundai Steel, too, insists that Commerce was required to waive and abandon its statutory interpretation on remand, thereby foreclosing any right of appeal. *See* Hyundai Steel Cmts. at 13. Like SeAH, Hyundai Steel fails to cite, and reconcile its position with, *Viraj Group*. To the extent that

Hyundai Steel is frustrated by the procedural posture of this litigation, it has no one to blame but itself for failing to timely challenge Commerce's statutory interpretation before the first remand proceeding.

### III. Commerce's Particular Market Situation Adjustment To The Cost Of Production For The Sales-Below-Cost Test Is In Accordance With Law

The plain language of the statute and the legislative history of the TPEA amendments provide that when Commerce determines a particular market situation exists, Commerce possesses the discretion to adjust the respondents' input costs that are outside of the ordinary course of trade. *See* Second Remand Results at 2-7. In selecting a calculation methodology to address distortions in a particular market, Commerce also has significant discretion. *Id*. Here, Commerce found that it had the statutory authority to make a particular market situation adjustment to the cost of production for the sales-below-cost test for home market sales. *Id.* at 7. Commerce's interpretation is consistent with the statute.

The statute requires Commerce in antidumping proceedings to determine normal value based on the rules set forth in 19 U.S.C. § 1677b to achieve a "fair comparison" between normal value and export price. 19 U.S.C. § 1677b(a). The definition of normal value (not just constructed value) requires that normal value reflect a price that is in the "ordinary course of trade." *Id.* § 1677b(a)(1)(B)(i). This carries through to the subsection (b) normal value provisions concerning sales below cost. *Id.* §§ 1677b(b)(1), (3) (subsection (b)(3) uses the similar term "ordinary course of business"). The TPEA generally expanded the meaning of "ordinary course of trade" to include any situation in which Commerce finds that a particular market situation prevents a proper comparison between markets. *See id.* § 1677(15)(C) (Commerce "shall consider" such transactions outside ordinary course of trade). It also authorizes Commerce to use "any" alternative cost calculation methodology if it determines that

a "particular market situation exists such that the cost of materials . . . does not accurately reflect the cost of production in the ordinary course of trade." *Id.* § 1677b(e).

Although 19 U.S.C. § 1677b(e) is the subsection that applies to constructed value, given the applicability of the definition "ordinary course of trade" when Commerce determines normal value, *id.* § 1677b(a)(1)(B)(i), it would be illogical to conclude that Congress intended for Commerce not to rely on costs distorted by a particular market situation for constructed value, but still to rely on those same distorted costs for purposes of cost of production and the sales-below-cost test. *See* Second Remand Results at 7.

Based on this statutory language and further evidence of legislative intent, Commerce consistently has found that Section 504 of the TPEA added the concept of a particular market situation in the definition of the term "ordinary course of trade," for purposes of constructed value, "and through these provisions for purposes of the cost of production under {19 U.S.C. § 1677b(b)(3)}." *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, 85 Fed. Reg. 71,055 (Dep't of Commerce Nov. 6, 2020) (*CWP from Korea*) (final results of admin. review), and accompanying IDM at 8. Although this Court has disagreed with Commerce's interpretation of the statute as noted above, respectfully, those non-precedential cases have not proceeded to final judgment and some are distinguishable.

For example, in *Saha Thai,* Commerce used the same methodology it used here—in other words, Commerce made a particular market situation adjustment to the cost of production for the sales-below-cost test for home market sales. The Court rejected Commerce's application of a particular market situation adjustment, because the Court determined that the amended statute is only applicable "when constructed value is the basis of 'normal value,' not home-market sales."

*Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 422 F. Supp. 3d 1363, 1369-70 (Ct. Int'l Trade 2019).

Then, after Commerce issued its remand determination, the Court again rejected Commerce's revised methodology, in which Commerce maintained its particular market situation determination, but declined to conduct the sales-below-cost test, and instead, "made a particular market situation determination under 19 U.S.C. § 1677(15)(C), stating that the distorted cost of production prevented a proper comparison between home market sales and export prices, and disregarding all home market sales." *Saha Thai Steel Pipe Public Co., Ltd. v. United States*, 487 F. Supp. 3d 1323, 1327 (Ct. Int'l Trade 2020). The Court held that "Commerce did not follow the specified method when it disregarded as outside the ordinary course of trade sales made purportedly at prices below the cost of production, without confirming that the sales were in fact made below the cost of production by conducting the sales-below-cost test." *Id.* at 1331-32. Further, the Court held that "{t}he statute requires Commerce to conduct the sales-below-cost test set forth in Section 1677b(b)(1) before disregarding below-cost sales as outside the ordinary course of trade under Section 1677(15)(A)." *Id.* at 1332.

Here, in contrast, Commerce based its particular market situation adjustment on home market sales, not on constructed value. *See* Second Remand Results at 2-7. In other words, Commerce used the same methodology that it used the first time in *Saha Thai*. Although the Court rejected the methodology, that decision is not yet final, nor has the Government determined whether to seek authority to appeal it.

Accordingly, given the broad discretion afforded to Commerce in the statutory language and the legislative history regarding the "particular market situation" concept, Commerce's

-11-

adjustment of the respondents' cost of production is a reasonable interpretation of the statute and is in accordance with law.

In its comments, Hyundai Steel makes numerous challenges to the second remand results. First, Hyundai Steel claims that Commerce omitted the words "For purposes of paragraph (1)" from its statutory interpretation, which language, Hyundai Steel argues, was intended to limit the scope of Commerce's authority to redress a particular market situation. Hyundai Cmts. at 4-6. Other than these words, Hyundai Steel cites no support for its argument that these words were intended as a limitation on Commerce's authority. Commerce acknowledged Hyundai Steel's comment regarding the alleged omission in the second remand results, Second Remand Results at 8, but disagreed with Hyundai Steel's suggestion "that Congress intended the TPEA to protect American workers only in situations where home-market prices do not exist," which is the logical conclusion of Hyundai Steel's argument. *Id*. at 13.

Second, Hyundai Steel argues that Commerce's statutory interpretation is inconsistent with several precedential decisions of this Court. Hyundai Steel Cmts. at 7-8. This is true; Commerce explicitly acknowledged these precedential decisions and expressed its respectful disagreement with them. Second Remand Results at 13 & n.55. As Commerce explained, the holdings in these cases "necessarily creat{e} a mismatch between home-market price and {constructed value} that is not supported by" the legislative history cited by Commerce in the second remand results. *Id*. at 13. As the Court recognized in *Hyundai II*, "there has not been an opinion from the U.S. Court of Appeals for the Federal Circuit on whether cost-based particular market situation determinations and subsequent adjustments are in accordance with law." 483 F. Supp. 3d at 1277. Commerce is entitled to "zealously advocate" and preserve the United States'

appeal rights unless and until the Court forces a contrary position on Commerce, which Commerce may adopt under protest.  *See Viraj Group*, 343 F.3d at 1375.

Third, Hyundai Steel argues that legislative history is neither relevant nor a basis on which Commerce may rely to "overrid{e} the unambiguous language of the statute."  Hyundai Steel Cmts. at 8.  Although Hyundai Steel states that the statutory language is unambiguous, *id*. at 8-9, it fails to address the fundamentally illogical intent that it ascribes to Congress – why would Congress intend for Commerce not to rely on costs distorted by a particular market situation for constructed value, but still rely on the same distorted costs for purposes of cost of production and the sales-below-costs test?  *See* Second Remand Results at 7.  Absent a rational reading of the statute based on the so-called plain language of the statute, it was perfectly appropriate for Commerce to consider the legislative history, which, Commerce explains, supports its statutory interpretation.  *See id.* at 5-7, 12-13.  Notably, Hyundai Steel does not identify any legislative history that supports the irrational intent it imputes to Congress; it merely belittles the legislative history cited by Commerce.  *See* Hyundai Steel Cmts. at 10-12.  That does not make the intent that Hyundai Steel imputes to Congress any more rational.

Finally, for its part, SeAH largely fails to comment on the substance of Commerce's second remand results.  Although it cites and discusses the Court's precedent in the body of its comments, that precedent predates the remand results on which SeAH is purporting to comment.  Instead, SeAH relegates its response to the substance of the second remand results to a single footnote, which may be disregarded.  *Compare* SeAH Cmts. at 4 n.10 *with SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (explaining an argument needs to be developed, not just in a footnote).  As Judge Musgrave explained in *Fuji America Corp. v. United States*, 30 CIT 1991, 1993 n.1 (2006):

In any event, it is doubtful that this issue carries much weight as it was "raised" exclusively in a footnote. The Court understands that footnotes are, at best, a means of clarifying or reinforcing a point or points made in the text and not for raising new arguments or issues. A review of various authorities bolsters this view. As stated by one: "Don't count on readers to look at your substantive footnotes. Most readers find shifting their attention up and down the page tiring and distracting. And the very fact that the material is footnoted rather than in the body of the writing signals that the content is not of central importance.... Some courts will disregard arguments raised exclusively in footnotes. Bryan A. Garnet, *The Redbook, A Manual on Legal Style* § 9.9 (2d ed. 2006). As stated by another: "The pseudo-scholarly approach of tackling substantive, sometimes quite subtle, themes and topics in the fine print of footnotes is a fierce distraction. Burying an argument in a footnote, and expecting the reader to excavate it, is simply inexcusable." Tom Goldstein & Jethro K. Lieberman, *The Lawyer's Guide to Writing Well* 100 (2d ed. 2002). Indeed, were the issue of such importance, the Court would expect it to be fleshed out during the normal course of briefing- which was not the case in the instant action.

Accordingly, Commerce complied with the Court's remand order, and Commerce's remand redetermination is supported by substantial evidence and otherwise in accordance with law.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand determination and enter final judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

| | |
|---|---|
| OF COUNSEL: | /s/ Patricia M. McCarthy |
| | PATRICIA M. MCCARTHY |
| ELIO GONZALEZ | Assistant Director |
| Senior Attorney | U.S. Department of Justice |
| Office of the Chief Counsel | Commercial Litigation Branch |
|    for Trade Enforcement & Compliance | P.O. Box 480, Ben Franklin Station |
| U.S. Department of Commerce | Washington, D.C. 20044 |
| | Tel: (202) 307-0164 |
| | Fax: (202) 307-0972 |
| | Email: patricia.mccarthy@usdoj.gov |
| April 16, 2021 | Attorneys for Defendant United States |

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 4,228 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

     /s/ Patricia M. McCarthy
     Patricia M. McCarthy
     Assistant Director
     U.S. Department of Justice
     Civil Division