Slip Op. 22-67

## UNITED STATES COURT OF INTERNATIONAL TRADE

HYUNDAI STEEL COMPANY,

      Plaintiff,

and

SEAH STEEL CORPORATION,

      Consolidated Plaintiff and
      Plaintiff-Intervenor,

v.

UNITED STATES,

      Defendant,

and

WHEATLAND TUBE COMPANY,

      Defendant-Intervenor.

Before:  Jennifer Choe-Groves, Judge

Consol. Court No. 18-00154

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's third remand results of the 2015–2016 administrative review of the antidumping duty order on circular welded non-alloy steel pipe from the Republic of Korea.]

Dated: June 15, 2022

J. David Park, Henry D. Almond, Daniel R. Wilson, Leslie C. Bailey, and Kang Woo Lee, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., for Plaintiff Hyundai Steel Company.

Jeffrey M. Winton and Amrietha Nellan, Winton & Chapman PLLC, of Washington, D.C., for Consolidated Plaintiff and Plaintiff-Intervenor SeAH Steel Corporation.

Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, and Jeanne E. Davidson, Director.  Of counsel on the brief was Elio Gonzalez, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Roger B. Schagrin and Elizabeth J. Drake, Schagrin Associates, of Washington, D.C., for Defendant-Intervenor Wheatland Tube Company.

Choe-Groves, Judge:  Plaintiff Hyundai Steel Company ("Hyundai Steel") and Consolidated Plaintiff and Plaintiff-Intervenor SeAH Steel Corporation ("SeAH") (collectively, "Plaintiffs") challenge the final determination in the 2015–2016 administrative review of the antidumping duty order covering circular welded non-alloy steel pipe ("CWP") from the Republic of Korea ("Korea").  Circular Welded Non-Alloy Steel Pipe from the Republic of Korea ("Final Results"), 83 Fed. Reg. 27,541 (Dep't of Commerce June 13, 2018) (final results of antidumping duty administrative review; 2015–2016); see also Issues and Decision Mem. for the Final Results of Antidumping Duty Admin. Review of Circular Welded Non-Alloy Steel Pipe from the Republic of Korea; 2015–2016 ("Final IDM"), PR 314.[1]

---

[1] Citations to the administrative record reflect the public record ("PR") and confidential record ("CR") document numbers filed in this case, ECF Nos. 50, 51.

Before the Court are the Final Results of Redetermination Pursuant to Court Remand ("Third Remand Results"), ECF No. 94-1, ordered in Hyundai Steel Co. v. United States ("Hyundai Steel III"), 45 CIT __, __, 531 F. Supp. 3d 1344, 1353–54 (2021).  Hyundai Steel requests that the Court sustain Commerce's Third Remand Results, noting that although Commerce continues to find that a particular market situation existed in Korea during the period of review, Commerce under protest recalculated Hyundai Steel's weighted-average dumping margin by eliminating the particular market situation adjustment of the Final Results with respect to Hyundai Steel.  Pl. Hyundai Steel's Comments Commerce's Third Remand Results ("Hyundai Steel's Cmts.") at 1–5, ECF No. 99.  SeAH, a non-examined respondent, argues that remand is again required because the margin rate that Commerce recalculated is a simple average of the margins for the two mandatory respondents, Hyundai Steel and Husteel Co., Ltd. ("Husteel").  See Comments SeAH Opp'n Commerce's Sept. 8, 2021 Redetermination ("SeAH's Cmts.") at 1–6, ECF No. 96.  According to SeAH, Commerce eliminated the particular market situation adjustment for Hyundai Steel and also eliminated the particular market situation adjustment to the sales-below-cost test for Husteel during the third remand, but Commerce continued to make an improper particular market situation adjustment to Husteel's normal value for transactions determined to be based on constructed value when recalculating SeAH's rate, and therefore

this non-examined respondent rate continues to be tainted.  <u>See</u> <u>id.</u> at 3–5; <u>see also</u> <u>Third Remand Results</u> at 6–7.

Defendant United States ("Defendant") argues that Commerce complied with the Court's remand order when it removed the particular market situation adjustment for Hyundai Steel under protest.  Def.'s Resp. Comments Regarding Third Remand Redetermination ("Def.'s Resp.") at 6–7, ECF No. 104.  Defendant also argues that Commerce calculated the dumping margin for SeAH by permissibly averaging the rates of the two mandatory respondents.  <u>Id.</u> at 7–8. Defendant-Intervenor Wheatland Tube Company ("Wheatland") filed comments in partial opposition, noting its support of Commerce's remand determination filed under protest.  Def.-Interv.'s Comments Partial Opp'n Remand Redetermination ("Def.-Interv.'s Cmts.") at 1, ECF No. 100.

For the following reasons, the Court sustains in part and remands in part the <u>Third Remand Results</u>.

**ISSUES PRESENTED**

The Court reviews the following issues:

1.    Whether Commerce's removal of the particular market situation adjustment when calculating Hyundai Steel's dumping margin is in accordance with the law; and

2.    Whether Commerce's calculation of SeAH's dumping margin is in

accordance with the law.

## BACKGROUND

The Court presumes familiarity with the facts and procedural history of this

case and recites the facts relevant to the Court's review of the Third Remand

Results.  See Hyundai Steel III, 45 CIT at __, 531 F. Supp. 3d at 1347–48; see also

Hyundai Steel Co. v. United States ("Hyundai Steel II"), 44 CIT __, __, 483 F.

Supp. 3d 1273, 1275–76 (2020); Hyundai Steel Co. v. United States ("Hyundai

Steel I"), 43 CIT __, __, 415 F. Supp. 3d 1293, 1295–1301 (2019).

In the Final Results, Commerce determined that a particular market situation

in Korea distorted the cost of production of CWP.  Final IDM at 3.  Commerce

also determined that it could quantify the amount of the distortion, and it made an

upward adjustment to the cost of production of CWP based on the subsidy rate of

hot-rolled steel coil.  Id. (citing Countervailing Duty Investigation of Certain Hot-

Rolled Steel Flat Products from the Republic of Korea, 81 Fed. Reg. 53,439 (Dep't

of Commerce Aug. 12, 2016) (final affirmative determination), as amended,

Certain Hot-Rolled Steel Flat Products from Brazil and the Republic of Korea, 81

Fed. Reg. 67,960 (Dep't of Commerce Oct. 3, 2016) (amended final affirmative

countervailing duty determinations and countervailing duty orders)).  Commerce

then conducted a sales-below-cost test and disregarded certain sales made at prices

below the cost of production, as adjusted.  See Decision Mem. for the Prelim.

Results of Antidumping Duty Admin. Review: Circular Welded Non-Alloy Steel

Pipe from the Republic of Korea: 2015–2016 ("Prelim. DM") at 19–20, PR 275;

Final IDM at 3 (noting that Commerce used the same calculation methodology for

the respondents not selected for individual examination for the Final Results as

explained in the Prelim. DM).  Commerce calculated normal value from the

remaining above-cost home market sales for mandatory respondents Hyundai Steel

and Husteel.  Prelim. DM at 20; Final IDM at 3.

     In Hyundai Steel I, 43 CIT at __, 415 F. Supp. 3d at 1301, the Court

concluded that Commerce's particular market situation determination was

unsupported by substantial evidence.  In the Final Results of Redetermination

Pursuant to Remand ("Remand Results"), ECF No. 73-1, subsequent to Hyundai

Steel I, Commerce conducted a new review of the record and again determined that

a particular market situation distorted the cost of hot-rolled steel coil in the Korean

market.  Remand Results at 4.  Commerce again made an upward adjustment to the

cost of hot-rolled steel coil, performed the sales-below-cost test, and calculated

normal value from the remaining above-cost home market sales.  See id.

     In Hyundai Steel II, 44 CIT at __, 483 F. Supp. 3d at 1279, 1281, the Court

remanded for Commerce to explain the statutory authority to conduct a cost-based

particular market situation analysis when normal value is based on home market

sales and to adjust the cost of production for purposes of the sales-below-cost test

of 19 U.S.C. § 1677b(b), specifically within the context of relevant caselaw from

this Court.  Commerce's second remand results explained its view that Section 504

of the Trade Preferences Extension Act of 2015 ("TPEA"), Pub. L. No. 114-27,

§ 504, 129 Stat. 362, 385, authorizes it to make such determinations and to adjust

the cost of production for the sales-below-cost test when calculating normal value

based on home market sales.  Final Results of Redetermination Pursuant Court

Remand ("Second Remand Results") at 3–4, ECF No. 85-1.

       In Hyundai Steel III, 45 CIT at __, 531 F. Supp. 3d at 1353, the Court

concluded that Commerce's cost-based particular market situation determination

and subsequent adjustment were not in accordance with the law.  The Court held

that when normal value is based on home market sales, 19 U.S.C. § 1677b does not

permit Commerce to make a particular market situation adjustment to the costs of

production for purposes of the sales-below-cost test of 19 U.S.C. § 1677b(b).  Id.

Under protest, Commerce eliminated the particular market situation adjustment in

its recalculation of the weighted-average dumping margin of Hyundai Steel.  See

Third Remand Results at 6; see also 19 C.F.R. § 351.405.  Commerce recalculated

the dumping margin rate for SeAH by recalculating the rate for the second

mandatory respondent, Husteel, using a particular market situation adjustment for

Husteel and then relying on a simple average of the recalculated rates for Hyundai

Steel and Husteel.  <u>Third Remand Results</u> at 6–7.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff

Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i), and 28 U.S.C. § 1581(c).

The Court will hold unlawful any determination found to be unsupported by

substantial evidence on the record or otherwise not in accordance with the law.  19

U.S.C. § 1516a(b)(1)(B)(i).  The Court also reviews determinations made on

remand for compliance with the Court's remand order.  <u>Ad Hoc Shrimp Trade</u>

<u>Action Comm. v. United States</u>, 38 CIT __, __, 992 F. Supp. 2d 1285, 1290

(2014), <u>aff'd</u>, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### I.      Recalculation of Hyundai Steel's Dumping Margin

In the <u>Third Remand Results</u>, Commerce stated that it continues to find that

a particular market situation existed in Korea during the period of review.  <u>Third</u>

<u>Remand Results</u> at 5; <u>cf.</u> Final IDM at 11–19.  Under protest, Commerce

recalculated Hyundai Steel's weighted-average dumping margin without a

particular market situation adjustment.  <u>Third Remand Results</u> at 6, 9, 10.

Hyundai Steel requests that the Court sustain Commerce's calculation of its

dumping margin without a particular market situation adjustment.  Hyundai Steel's

Cmts. at 1–2.  Wheatland agrees with Commerce's assertion that a particular

market situation existed in Korea during the period of review and supports

Commerce's decision to submit the Third Remand Results under protest.  Def.-

Interv.'s Cmts. at 1.  SeAH's comments as to its own issue (the rate for non-

examined respondents) indicate tacit support of Hyundai Steel's recalculated

dumping margin.  Cf. SeAH's Cmts. at 4–5 (highlighting Hyundai Steel's

"extensive comments to the Court following Commerce's first remand

determination").

Commerce's recalculation of Hyundai Steel's weighted-average dumping

margin without a particular market situation adjustment is consistent with the

Court's prior opinions and orders in Hyundai Steel I, Hyundai Steel II, and

Hyundai Steel III.  In addition, after Defendant filed the Third Remand Results

with this Court, in the appeal of this Court's decision concerning the 2015–2016

administrative review of the antidumping duty order on welded line pipe from

Korea, the U.S. Court of Appeals for the Federal Circuit confirmed that Congress

intended a particular market situation adjustment only for constructed value but not

for calculations of the cost of production, which impacts the sales-below-cost test

of 19 U.S.C. § 1677b(b).  Hyundai Steel Co. v. United States, 19 F.4th 1346, 1352

(Fed. Cir. 2021); see Husteel Co. v. United States, 44 CIT __, 426 F. Supp. 3d

1376 (2020).

On remand of this case, Commerce reasserted its determination that a particular market situation in Korea distorted manufacturers' cost of production. Third Remand Results at 5.  Commerce eliminated its particular market situation adjustment of Hyundai Steel's costs of production and recalculated.  Cf. Second Remand Results.  Hyundai Steel's recalculated rate in the Third Remand Results is 12.92% as compared to 30.85% in the Final Results.  Third Remand Results at 10; see also Final Results, 83 Fed. Reg. at 27,542.

In the third remand, Hyundai Steel obtains the relief it sought.  In light of the U.S. Court of Appeals for the Federal Circuit's decision in Hyundai Steel Co. v. United States, 19 F.4th 1346, 1352 (Fed. Cir. 2021), the Court sustains Commerce's removal of the particular market situation adjustment of Hyundai Steel's costs of production in the recalculation of Hyundai Steel's weighted-average dumping margin for the Third Remand Results.  The U.S. Court of Appeals for the Federal Circuit's opinion moots Hyundai Steel's further arguments on the particular market situation determination.  Hyundai Steel Co., 19 F.4th at 1348.  The Court sustains Commerce's recalculation of Hyundai Steel's dumping margin without the particular market situation adjustment in the Third Remand Results and does not consider Hyundai Steel's further arguments on Commerce's reiterated particular market situation determination.

## II.    Recalculation of SeAH's Dumping Margin

When calculating the dumping margin rate for SeAH, Commerce recalculated the rate for the second mandatory respondent, Husteel, who is not a party to this litigation.  Third Remand Results at 6.  Commerce stated that, in calculating Husteel's revised dumping margin, it applied a particular market situation adjustment for normal value when normal value is based on constructed value.  Id. at 6–7.  The Third Remand Results explain that Commerce based its particular market situation adjustment for Husteel on the reasons enunciated in the Final Results and the Remand Results.  Id. at 9.  Commerce applied a simple average of the recalculated rates for Hyundai Steel and Husteel to determine SeAH's new dumping margin.  Id. at 6–7.  Hyundai Steel's dumping margin rate changed from 30.85% to 12.92%, and the rate applicable to SeAH changed from 19.28% to 9.99%.  Id. at 10.  Commerce stated that it was "not revising the cash deposit or assessment rates for Husteel because Husteel is not a party to this litigation and is therefore not entitled to the benefit of the recalculation."  Id. at 6. Commerce disagreed with SeAH "that no particular market adjustment is warranted," and argued that "[b]ecause Husteel, unlike Hyundai, had comparisons to constructed value after we applied the sales-below-cost test, we made a particular market situation adjustment with respect to our calculation of constructed value for Husteel."  Id. at 10.

SeAH requests that the Court remand Commerce's <u>Third Remand Results</u>,

arguing that Commerce's calculation of SeAH's dumping margin improperly relied

on a particular market situation determination that was not supported by substantial

evidence.  SeAH's Cmts. at 1–5.  Defendant responds that Commerce's particular

market situation determination is supported by substantial evidence of the

cumulative effect of five factors: (1) subsidization by the Government of Korea of

hot-rolled coil; (2) Chinese steel products that flooded the Korean market;

(3) strategic alliances between certain Korean hot-rolled coil suppliers and CWP

producers; (4) distortions in the Korean electricity market; and (5) the Government

of Korea's role in restructuring the private steel industry.  Def.'s Resp. at 10–11.

Despite this assertion, Defendant admits that the evidence relied upon by

Commerce here is "the same as or similar to the evidence" that this Court has

previously held to be defective in supporting a particular market situation in Korea:

> Although the Court's decision in [<u>NEXTEEL Co. v. United States</u>
> ("<u>NEXTEEL II</u>"), 44 CIT __, 450 F. Supp. 3d 1333 (2020),] involves a
> separate antidumping duty order and a different determination by
> Commerce, we recognize that [the] facts are similar and that much of
> the evidence that Commerce considered in [<u>NEXTEEL II</u>] is the same
> as or similar to the evidence at issue in this case.  We respectfully
> disagree with the Court's opinion in [<u>NEXTEEL II</u>]. . . .

<u>Id.</u> at 11.  Commerce explained in the <u>Third Remand Results</u> that it made a

particular market situation adjustment to Husteel's rate "for the sole purpose of

calculating SeAH's rate."  <u>Third Remand Results</u> at 9.  Commerce stated that it

based its particular market situation determination for Husteel "on the reasons

enunciated" in the Final IDM and the Remand Results. Id. Accordingly, the Court

examines the evidence cited in the Final IDM and the Remand Results to

determine whether Commerce's particular market situation determination is

supported by substantial evidence.

The Court observes, generally, that the evidence cited by Commerce in

support of its particular market situation determination with respect to SeAH's

dumping margin calculation focused on periods of time before or after the relevant

2015–2016 timeframe, did not show price distortions specific to the Korean steel

market, was missing or incomplete in some instances, contained speculative and

conclusory statements, provided no evidence that Korean steel producers received

countervailable subsidies as to electricity, and speculated on effects outside the

timeframe of the period of review. Other observations are discussed in more detail

in the following section.

"It is well-established that an agency's action must be upheld, if at all, on the

basis articulated by the agency itself." Motor Vehicle Mfrs. Ass'n v. State Farm

Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983). Regarding the first factor, Commerce

determined that subsidies of hot-rolled coil production by the Government of

Korea contributed to a particular market situation in Korea. Final IDM at 11–12;

Remand Results at 7. In support of this conclusion, the Final IDM cites the

following three record documents from the October 16, 2017 particular market

situation allegation filed with Commerce by Wheatland: (1) "[Particular Market

Situation] Allegation at Attachment 13, Exhibit 12 (containing Letter from

Maverick [Tube Corporation ("Maverick")], 'Oil Country Tubular Goods from

South Korea: Particular Market Situation Case Brief,' dated March 1, 2017;"

(2) "[Particular Market Situation] Allegation at Attachment 13, Exhibit 4

(containing Letter from Maverick, 'Certain Oil Country Tubular Goods from the

Republic of Korea: Information and Comments Requiring Immediate Attention,'

dated November 25, 2015);" and (3) "at Attachment 11" (which, presumably, is

also from Wheatland's Particular Market Situation Allegation document).  Final

IDM at 11–12, nn.20 & 22; see also Def.-Interv.'s Particular Market Situation

Allegation ("Wheatland's Allegation"), PR 137–248, CR 170–255.  The

administrative record filed with the Court in this case does not include Attachment

11 to Wheatland's Allegation.  The public record includes a page reading "Exhibit

Not Susceptible to Public Summarization."  See Wheatland's Allegation,

Attachment 11.  The confidential version of Attachment 11 indicates only "Exhibit

Filed Separately as Spreadsheet" but gives no further indication of whether such

separate filing is included anywhere in the record before the Court.  Id.  In

addition, the Court is unable to locate "Exhibit 12" to "Attachment 13" that

purportedly supports Commerce's assertions that "the record evidence

demonstrates that the Korean government has subsidized [hot-rolled coil] and that the mandatory respondents have purchased [hot-rolled coil] from entities receiving these subsidies, including POSCO."  See Final IDM at 11 (citing "[Wheatland's] Allegation at Attachment 13, Exhibit 12 (containing Letter from Maverick, 'Oil Country Tubular Goods from South Korea: Particular Market Situation Case Brief,' dated March 1, 2017, at 6 and footnote 18, and sources cited therein)").[2] Because these two documents are missing from the record filed in this case, the Court is unable to ascertain whether Commerce's determination of subsidization by the Government of Korea is supported by substantial evidence based on these documents.

Furthermore, the Final IDM's citation to "[Wheatland's] Allegation at Attachment 13, Exhibit 4 (containing Letter from Maverick, 'Certain Oil Country

---

[2] In the public version of the administrative record before the Court, Attachment 13 is a letter from Maverick dated May 4, 2017.  See Wheatland's Allegation, Attachment 13.  Within that Attachment 13, the only apparent mention of a "March 1, 2017" letter from Maverick is a reference to that letter as "Exhibit 12" on page 5 of the May 4, 2017 letter.  Id. at 5.  Exhibit 12 to Attachment 13 contains "Electricity in Korea – Paper," dated May 16, 2011, which was published for an Asia-Pacific Economic Cooperation symposium.  See Wheatland's Allegation, Attachment 13, Ex. 12.  Exhibit 11 to Attachment 13 contains a "Letter from Maverick" pertaining to comments on the Government of Korea's supplemental questionnaire response regarding the investigation of welded line pipe from the Republic of Korea.  See Wheatland's Allegation, Attachment 13, Ex. 11.  Further, it is dated June 2, 2015 and the comments pertain to electricity in Korea, not HRC. See id.

Tubular Goods from the Republic of Korea: Information and Comments Requiring

Immediate Action,' dated November 25, 2015, at 3) and at Attachment 11" is

deficient not only as to the missing "Attachment 11" on the record before the Court

but also because Exhibit 4 to Attachment 13 consists only of particular market

situation *allegations* by Maverick (relating to a different proceeding), not actual

factual findings or evidence.  See Wheatland's Allegation, Attachment 13, Ex. 4.

("A finding that the alleged programs are countervailable *would confirm* the

existence of a particular market situation for the single largest cost component in

[Oil Country Tubular Goods] production . . ." (emphasis added)).  Because two

documents are missing from the record and one document consists of mere

allegations by a domestic producer, the Court concludes that none of the three

documents cited by Commerce in the Final IDM demonstrate that the evidence

addresses or even confirms the extent, if any, of subsidization of hot-rolled coil

production by the Government of Korea during the period of review.  The Court

concludes that Commerce's determination that subsidization contributed to a

particular market situation in Korea is unreasonable and not supported by

substantial evidence, due to inaccurate, insufficient, or missing record evidence

filed with the Court.

  As to the second factor, Commerce determined that significant overcapacity

in Chinese steel production caused flooding of the Korean steel market with

imports of low-priced Chinese steel products, which placed downward pressure on

Korean domestic steel prices.  Final IDM at 12; Remand Results at 7–8.  In support

of this determination, Commerce cited Wheatland's Allegation "at Attachment 13,

Exhibit 6 (containing Letter from Maverick, 'Certain Oil Country Tubular Goods

from the Republic of Korea: Particular Market Situations and Other Factual

Information Submission,' dated September 6, 2016, at Exhibit 4)."  Final IDM at

12 n.23.  Exhibit 4 consists of a Bloomberg article dated January 28, 2016, entitled

"POSCO Posts Smallest Ever Profit Amid Chinese Steel Deluge," which notes that

POSCO's prices plummeted due to demand in China contracting, creating a

surplus "overseas" and quoting a POSCO executive as stating that China is

flooding "the market" with extremely cheap products while also noting that "the

worst of the Chinese deluge may be over."  Wheatland's Allegation, Attachment

13, Ex. 4 at 2.  The Court observes that the article refers generally to flooding "the

market," but does not specify that the influx of Chinese products had an effect that

was unique or particular to Korea.  See id. at 1–2.  In fact, the same article opens

with a statement that "a deluge of Chinese exports pushed *global prices* to their

lowest in at least a decade."  Id. at 1 (emphasis added).  At best, the article suggests

that Korea experienced price pressures similar to other countries in the global

market due to Chinese flooding of cheap products, but the article does not clearly

support Commerce's determination in the Final Results that Korea's market

experienced a particular or unique situation that differed from the global impact on
other countries.  The Court notes that the same Bloomberg article dated January
28, 2016 also states that "[t]here are signs that the worst of the Chinese deluge may
be over."  Id. at 2.  The January 2016 article was published two months into the
relevant period of review (November 2015 to October 2016) and suggests that the
Chinese deluge may have been over near the beginning of the period of review,
which the Court observes may contradict Commerce's determination that Chinese
steel overproduction placed downward pressure on Korean domestic steel prices
during the period of review.  Although it is clear that the oversupply of low-priced
Chinese products affected many countries in the global market, the Court
concludes that the evidence cited by Commerce fails to demonstrate that the
oversupply of Chinese products was *particular* to the Korean market during the
period of review, especially in light of potentially contrary evidence on the record.

As to the third factor, Commerce determined that attempted strategic
alliances between certain Korean hot-rolled coil suppliers and Korean CWP
producers may have affected prices in 2012–2013 and subsequent periods,
including the period of review in this case.  Final IDM at 12; Remand Results at 8–
9.  In support of this determination, Commerce cited Wheatland's Allegation "at
Attachment 13, Exhibit 4 (containing Letter from Maverick, 'Certain Oil Country
Tubular Goods from the Republic of Korea: Information and Comments Requiring

Immediate Action,' dated November 25, 2015, at Attachment 4)."  Final IDM at 12

n.24.  The information in "Attachment 4" to that Maverick letter is completely

redacted.  Wheatland's Allegation, Attachment 13, Ex. 4.  The Court is thereby

precluded from evaluating whether substantial evidence supports Commerce's

determination on this third factor.

      As to the fourth factor, Commerce determined that a particular market

situation may exist when there is government control over prices to such an extent

that home-market prices are not competitive.  Final IDM at 12; Remand Results at

9–10.  With respect to Korea specifically, Commerce first determined that

electricity in Korea functions as a tool of the government's industrial policy.  Final

IDM at 12; Remand Results at 9, 35.  To support this point, the Final IDM refers to

Wheatland's Allegation[3] "at Attachment 12, Exhibit 1 (containing Letter from

Maverick, 'Certain Oil Country Tubular Goods from the Republic of Korea:

Submission of Factual Information Relating to Particular Market Situation

Allegations,' dated August 7, 2017, at Exhibits 6 and 7)."  Final IDM at 12 n.26.

Exhibit 1 referenced by Commerce is a one-page spreadsheet entitled "Korea

---

[3] The Court presumes that the use of "Id." in note 26 refers to Wheatland's
Allegation and not to note 25's reference to the "Statement of Administrative
Action (SAA) accompanying the Uruguay Round Agreements Act, H.R. Doc. No.
103-316, Vol. 1, at 822, reprinted at 1994 U.S.C.C.A.N. 4040, 4162 (1994)."  See
Final IDM at 12 nn.25 & 26.

Electric Power Company" showing a breakdown of "Industrial (B) * General (B):

contract demand of 300KW or more" into classifications of "High Voltage (A),"

"High Voltage (B)," and "High Voltage (C)" categories, with three "Options"

pertinent to each classification, and a series of numbers listed in various columns

denoting demand charge (KRW/kW) and energy charge (KRW/kW). Wheatland's

Allegation, Attachment 12, Ex. 1 at 1. The document's relevance is not explained

further. Absent any further explanation, the Court observes that it is unable to

draw any conclusions from this document as to whether the record evidence

supports Commerce's determinations that Korean steel manufacturers received

subsidies as to electricity, or that the Government of Korea's regulation of the

electricity market contributed to a particular market situation.

The Final IDM next states that the largest electricity supplier, the Korean

Electric Power Corporation ("KEPCO"), is a "government-controlled entity."

Final IDM at 12. For support, the Final IDM refers to Wheatland's Allegation at

"Attachment 13, Exhibit 5 (containing Letter from Maverick, 'Certain Oil Country

Tubular Goods from the Republic of Korea: Particular Market Situation Allegation

on Electricity,' dated February 3, 2016, at 13–14 and Exhibit 2, p. 50)." Id. at 12

n.27. Maverick's particular market situation narrative is a mere allegation and the

Court does not consider Maverick's letter to be proper evidence that supports

Commerce's determinations. See Wheatland's Allegation, Attachment 13, Ex. 5 at

13–14.  Exhibit 2 is a Form 20-F filed for KEPCO with the U.S. Securities and

Exchange Commission ("SEC") on April 30, 2014.  Wheatland's Allegation,

Attachment 13, Ex. 5 at Ex. 2.  The disclosures in the SEC filing pertain mostly to

fiscal year 2013, not to the period of review of 2015–2016, and describe general

information related to a utility regulated by the SEC.[4]  To the extent that

---

[4] For example, page 50 of Exhibit 2 of the relevant Maverick Particular Market Situation Allegation states in pertinent part:

> For the period since 2006, our actual rates of return have been lower than the fair rate of return largely due to a general increase in fuel costs and additional facility investment costs incurred, the effects of which were not offset by timely increases in our tariff rates.  Partly in response to the variance between our actual rates of return and the fair rates of return, the Government from time to time increases the electricity tariff rates, but there typically is a significant time lag for the tariff increases as such increases requires a series of deliberative processes and administrative procedures and the Government also has to consider other policy considerations, such as the inflationary effect of overall tariff increases and the efficiency of energy use from sector-specific tariff increases.

> Recent increases to the electricity tariff rates by the Government involve the following, which were made principally in response to the rising fuel prices which hurt our profitability as well as to encourage a more efficient use of electricity by the different sectors:

> - effective August 1, 2011, a 4.9% overall increase in our average tariff rate, consisting of increases in the industrial, commercial, residential, educational, street lighting and overnight power usage tariff rates by 6.1

(footnote continued)

Consol. Court No. 18-00154                                                      Page 22

Commerce could reasonably determine from the Form 20-F document that the

conditions of the Korean electricity market remained unchanged throughout 2014

and the period of review, its page 50 might provide a modicum of support for that

inference, but the Court concludes that the cited evidence does not address whether

Korean steel manufacturers received subsidies as to electricity or whether the

Government of Korea's regulation of the electricity market contributed to a

particular market situation during the period of review.

    As to the fifth factor addressed in the Remand Results, Commerce

determined that the Government of Korea's plan to restructure the private steel

industry in Korea "is indicative of a [particular market situation]."  Remand

Results at 11–12.  In support of this determination, Commerce cited as record

---

%, 4.4%, 2.0%, 6.3%, 6.3% and 8.0%, while making no changes to the agricultural tariff.

- effective December 5, 2011, a 4.5% overall increase in our average tariff rate, consisting of increases in the industrial, commercial, educational and street lighting tariff rates by 6.5%, 4.5%, 4.5% and 6.5%, while making no changes to the residential, agricultural and overnight power usage tariff.

- effective August 6, 2012, a 4.9% overall increase in our average tariff rate, consisting of increases in the residential, commercial, educational, industrial, street lighting, agricultural and overnight power usage tariff rates by 2.7%, 4.4%, 3.0%, 6.0%, 4.9%, 3.0% and 4.9%, respectively.

Wheatland's Allegation, Attachment 13, Ex. 5 at Ex. 2 at 50.

evidence "Wheatland's [] Allegation at Attachment 14, Exhibit 12 (containing

'Korean Ministry of Strategy and Finance, Press Release: Government Unveils

2017 Action Plan to for Industrial Restructuring' (January 25, 2017))" and

"Wheatland's [] Allegation, Attachment 12, Exhibit 3 [sic] (containing 'Severe

Excess Supply in Steel Pipe, Cold Rolled and Plate Sectors . . . Concerns Loom

over Dongkook Steel and SeAH Group,' Invest Chosun, dated May 20, 2016)."

See Remand Results at 11 nn.45 & 46.  Those documents were submitted as part of

Maverick's and U.S. Steel Corporation's particular market situation allegations in

an administrative review of Oil Country Tubular Goods from Korea, 82 Fed. Reg.

18,105 (Dep't of Commerce Apr. 17, 2017).  See Wheatland's Allegation,

Attachment 12, Ex. 2;[5] id., Attachment 14, Ex. 12.  Commerce stated in its

Remand Results:

> This type of active government involvement in the steel industry's
> response to market overcapacity is indicative of a [Particular Market
> Situation].  This is precisely the type of interference that meets the
> definition of a [Particular Market Situation].  As stated in the TPEA, a
> [Particular Market Situation] "exists such that the cost of materials and
> fabrication or other processing of any kind does not accurately reflect
> the cost of production in the ordinary course of trade."  The Korean
> government's assistance to accelerate the steel industry's response and
> restructuring interferes with the normal functioning of the free market
> and *alters the ordinary course of trade*.  Outside government
> interference in the steel industry in response to particular market
> conditions that affected such industry to the point that the industry may
> need to undergo restructuring is highly unusual and does not represent

---

[5] The Remand Results incorrectly cite to Exhibit 3, rather than Exhibit 2.

the ordinary course of trade.  When the investment industry expressed the view that the Korean steel industry needed additional restructuring, as shown in Invest Chosun, the Korean government quickly intervened to assist the steel industry to restructure, as expressed in the press release from the Korean Ministry of Strategy and Finance.  We recognize that the government's announcement of additional restructuring of [the] steel industry occurred within months of the end of the [period of review].  Nonetheless, we conclude that the conditions that led to the government's announcement existed during the [period of review].

Remand Results at 11–12 (footnote omitted; emphasis added).

The Court observes that the referenced documents in support of this statement do not support any particular market situation determinations as to the Government of Korea's actions vis-a-vis "the market" during the period of review. See also NEXTEEL II, 44 CIT at __, 450 F. Supp. 3d at 1343 (discussing the same press release from the Korean Ministry of Strategy and Finance announcing the Government of Korea's "2017 Action Plan for Industrial Restructuring," dated January 25, 2017).  The Remand Results are also unclear as to whether a particular market situation *caused* the Government of Korea to become involved in industry restructuring, or that a particular market situation would arise *as a result of* the Government of Korea's involvement—which would concern matters beyond the confines of the period of review.  The Court notes that the evidence cited by Defendant does not support the fifth factor of its particular market situation analysis.

## CONCLUSION

The Court concludes that Commerce's calculation of Hyundai Steel's dumping margin rate without a particular market situation adjustment is in accordance with the law and sustains Commerce's determination on the issue of Hyundai Steel's dumping margin rate.

The Court concludes that Commerce calculated SeAH's dumping margin improperly using an average of dumping rates based in part on a particular market situation determination that is unsupported by substantial evidence, and remands for Commerce to recalculate SeAH's dumping margin in accordance with this opinion.

Accordingly, it is hereby

**ORDERED** that the Third Remand Results are sustained with respect to Commerce's recalculation of the dumping margin for Hyundai Steel; and it is further

**ORDERED** that the Third Remand Results are remanded for Commerce to recalculate the dumping margin for SeAH in light of this opinion; and it is further

**ORDERED** that this case will proceed according to the following schedule:

(1)  Commerce shall file the fourth remand results on or before

August 15, 2022;

(2)  Commerce shall file the administrative record on or before

Consol. Court No. 18-00154                                              Page 26

August 29, 2022;

(3)   Comments in opposition to the fourth remand results shall be

filed on or before September 19, 2022;

(4)   Comments in support of the fourth remand results shall be filed

on or before October 3, 2022; and

(5)   The joint appendix shall be filed on or before October 11, 2022.


                                                    /s/ Jennifer Choe-Groves
                                                Jennifer Choe-Groves, Judge

Dated:      June 15, 2022
            New York, New York